**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 1:05-CR-248 |
| v. : | |
| : | (Judge Kane) |
| EFRAIN MUNOZ-VILLALBA, : | |
| THOMAS GUERRERO : | |
| Defendants : | |

**MEMORANDUM AND ORDER**

Before the Court are Defendants' Motions to Suppress Evidence. (Doc. Nos. 46, 49.) The Court held an evidentiary hearing to consider the Motions on October 11, 2005. The Government filed a brief in opposition to both Motions on October 21, 2005 (Doc. No. 67), and Defendants replied in separate briefs (Doc. Nos. 68, 69). The Motions are ripe for disposition and, for the reasons that follow, Defendant Munoz-Villalba's Motion will be denied and Defendant Guerrero's Motion will be granted.

**I.    Background**

   **A.    Factual Background[1]**

On June 4, 2005, Pennsylvania State Police Trooper Marlin Foulds was positioned on the westbound lane of Pennsylvania Turnpike Interstate 76, in Upper Allen Township, Cumberland County, conducting speed enforcement. (Transcript of October 11, 2005 hearing, at 5-6.) Trooper Foulds used a radar gun to determine the speed of vehicles traveling past his position on the turnpike. (Id.) The posted speed limit at his location was 65 miles per hour. (Id.) At approximately 6:40 p.m., Trooper Foulds observed a red Nissan Sentra traveling westbound at 85 miles per hour. (Id.) Trooper Foulds activated his emergency lights and siren, stopping the

---

[1] The following facts are taken from testimony given at the October 11, 2005 evidentiary hearing.

vehicle one mile down the Turnpike at milepost 234.  (Id.)  Trooper Foulds positioned his vehicle behind the Sentra along the side of the road.  (Id.)

The Sentra displayed a Maryland license plate and contained two occupants, Defendants Efrain Munoz-Villalba and Thomas Guerrero.  (Id. at 7, 8, 13.)  Munoz-Villalba occupied the driver's seat and Guerrero sat beside him in the front passenger's seat.  (Id. at 7.)  Trooper Foulds approached Munoz-Villalba and asked for his driver's license, registration, and proof of insurance.  (Id.)  Munoz-Villalba produced a Washington, D.C. driver's license and a rental agreement for the vehicle.  (Id.)  According to the rental agreement, Munoz-Villalba was not the renter of the vehicle, nor was he listed as an additional driver.  (Id. at 8.)  When questioned on this point, Munoz-Villalba stated that his aunt, who was currently visiting Reading, Pennsylvania, had rented the vehicle.  (Id. at 9.)

Trooper Foulds took the license and rental agreement back to his patrol car to verify the information.  (Id. at 10.)  This check confirmed that the license and registration were valid.  (Id.)  The rental agreement stated that the Nissan Sentra had approximately 3,200 miles on the odometer when it was rented on May 21, 2005.  (Id. at 10, 23.)  Upon returning to the vehicle, Trooper Foulds asked Munoz-Villalba to verify the Sentra's current mileage, which was in excess of 6,000 miles.  (Id. at 11.)  In 14 days, the vehicle had been driven approximately 3,000 miles.  (Id.)

Trooper Foulds asked Munoz-Villalba how many trips he had made to Reading, Pennsylvania.  Id. at 12.  Foulds responded that he had traveled to Reading four or five times in the past and that his Aunt was visiting the Reading area.  (Id.)  Munoz-Villalba also stated that he was currently traveling to Reading.  (Id.)  Trooper Foulds pointed out to Munoz-Villalba that

the road he was on traveled away from Reading. (Id.) Munoz-Villalba responded that he was lost. (Id.) During this time, Guerrero sat silently in the front passenger seat. (Id. at 12-13.) Trooper Foulds asked Guerrero for identification. (Id. at 13.) Because Guerrero does not speak English, Munoz-Villalba translated the Trooper's order. (Id. at 13-14, 17.) Guerrero provided a Republic of Panama identification card. (Id. at 14.) "At that point [Trooper Foulds] determined that both [Defendants] are . . . originally from Republic of Panama." (Id.) Trooper Foulds returned to his patrol car to conduct a check on Guerrero's information. (Id.) The National Crime Information Center indicated that no warrants were outstanding for Guerrero. (Id.)

At approximately 6:45 p.m., Trooper Foulds radioed for assistance, asking for Pennsylvania State Police Trooper Todaro of the Bureau of Criminal Investigation, Drug Law Enforcement Division, Central Interdiction Unit. (Id. at 46-47.) Trooper Todaro also is assigned to a narcotics task force, along with members of the United States Drug Enforcement Agency and the Attorney General's Office, Bureau of Narcotics Investigation. (Id.) Trooper Todaro arrived on the scene ten to fifteen minutes later, while Trooper Foulds wrote a traffic citation for violation of the speed limit. (Id. at 47, 50.) When he arrived, Trooper Todaro positioned his unmarked vehicle behind Trooper Foulds' police car. (Id. at 50.) Both troopers were in uniform. (Id. at 30-31.)

Trooper Foulds relayed his concerns about the Defendants to Trooper Todaro. (Id. at 51.) Trooper Foulds then asked Munoz-Villalba to exit his vehicle and move to the back of the car, while Trooper Todaro positioned himself on the passenger side of the vehicle, near Guerrero. (Id. at 15-16.) Trooper Todaro explained the citation, returned Defendants' documents, and told Munoz-Villalba that he was free to go. (Id.) Munoz-Villalba asked Trooper

3

Foulds how to get back to Reading and Foulds gave him directions. (Id. at 17, 65.) Trooper Foulds asked Munoz-Villalba if "he had any type of contraband, weapons, stolen property, [or] drugs that may be in his vehicle." (Id. at 17.) When Munoz-Villalba answered in the negative, Trooper Foulds asked Munoz-Villalba if he could search the vehicle. (Id. at 17-18, 54, 76, 86.)

The testimony at the evidentiary hearing conflicts as to what happened next. Troopers Foulds and Todaro testified at hearing that Munoz-Villalba consented to the search. (Id. at 17-19, 54, 76.) The portion of Trooper Foulds' report read into the record during the hearing states that Munoz-Villalba "seemed nervous. . . . I asked him if all the items in the vehicle were his, and he stated that they were." (Id. at 76.) The troopers then stated that Guerrero was asked to exit the vehicle. (Id. 54-55.) The troopers patted down Defendants and found no narcotics or weapons. (Id. at 77.) Trooper Foulds took the Defendants to a grassy area a few feet away from the vehicle, while Trooper Todaro searched the vehicle. (Id. at 18, 54-55.)

In contrast to the troopers' testimony, Defendant Munoz-Villalba testified at hearing that he never gave the troopers consent to search the vehicle. (Id. at 86-88.) Rather, when asked if they could search the car, Munoz-Villalba testified that he asked if it was necessary. (Id.) At this point, Munoz-Villalba testified that Trooper Todaro pulled him and Defendant Guerrero to the side of the road, searched them, and told them to sit down. (Id.) Munoz-Villalba testified that, although he was told he was free to go, he did not feel free to leave. (Id. at 89.)

It is uncontested that Trooper Todaro performed a cursory visual search of the vehicle's interior, beginning with the front driver and passenger areas. (Id. at 55.) Finding nothing of note, Trooper Todaro searched the back seats and the trunk. (Id.) In the trunk, Trooper Todaro found a 9 inch by 9 inch by 14 inch box with a "Conair Fabric Steamer" label on it. (Id. at 56.)

Upon opening this box, Trooper Todaro found a large "Ziploc baggy" wrapped in clear white tape. (Id.) Looking through the clear plastic bag, Trooper Todaro observed two individual bags containing brownish powder, which Trooper Todaro suspected was heroin, and a bag containing a "chunky, powdery, tannish substance" also thought to be narcotics. (Id.) Trooper Todaro testified at hearing that when he asked Munoz-Villalba what the bags contained, Munoz-Villalba responded "you know what it is." (Id at 57.) At that point the troopers placed both Defendants under arrest. (Id.) During a search of Guerrero incident to arrest, the State Police discovered a bag containing 30 grams of crack cocaine hidden inside of his sock. (Id. at 59.) Guerrero also had $680 in currency on his person. (Id.) The State Police seized $2,116 in currency from Munoz-Villalba. (Id.)

The Nissan Sentra was towed to the State Police barracks in Newville, Pennsylvania. (Id. at 57.) After obtaining a search warrant for the vehicle, a more extensive search was preformed. (Id. at 58.) This search resulted in the discovery of a loaded Smith and Wesson 9-millimeter handgun hidden behind the plastic molding beneath the dashboard. (Id.) Tests performed by the State Police on the substances found in the trunk of the Sentra confirmed that the bags contained heroin, methamphetamine, and "crack" cocaine. (Id. at 59.) Defendants' Miranda rights were read to them by a Spanish-speaking officer and both declined to answer questions concerning the narcotics and firearm found in the vehicle. (Id. at 60.)

### B.  Procedural History

By indictment filed June 22, 2005, the Grand Jury charged Defendants with the following offenses: possession with the intent to distribute 100 grams or more of heroin (Count II); possession with the intent to distribute 50 grams or more of methamphetamine (Count III);

possession with the intent to manufacture and distribute "crack" cocaine and methamphetamine; and possession of a firearm in furtherance of a drug trafficking crime (Count IV). (Doc. No. 1.) By the same indictment, Defendant Guerrero was also charged separately with possession with the intent to distribute 5 grams or more of "crack" cocaine (Count I). (Id.) Both Defendants pled not guilty to the charges in the indictment. (Doc. No. 16, 23.) On September 9, 2005, Defendant Munoz-Villalba filed a Motion to Suppress Evidence, arguing that the warrantless search of the Sentra violated his Fourth Amendment rights. (Doc. No. 46.) Munoz-Villalba seeks suppression of the drugs and firearm found in the Sentra, the currency found on his person, and any statements made during his alleged detention. On September 16, 2005, Defendant Guerrero filed a Motion to Suppress Evidence, arguing that his search incident to arrest violated his Fourth Amendment rights because the arresting officer lacked probable cause to arrest him. (Doc. No. 49.) Guerrero seeks suppression of the drugs and currency found during the search incident to his arrest. The Court held an evidentiary hearing on October 11, 2005. (Doc. No. 59.) The Government filed a brief in opposition to both motions on October 21, 2005. (Doc. No. 67.) Defendant Guerrero filed a brief in reply on October 28, 2005 (Doc. No. 68) and Defendant Munoz-Villalba filed a brief in reply on October 31, 2005 (Doc. No. 69).

**II.** **Discussion**

    **A.** **Search of the Vehicle**

It is uncontested that Defendant Munoz-Villalba was speeding and that Trooper Foulds had probable cause to stop and briefly detain Defendants while he issued them a traffic citation. (Doc. No. 69 at 4.) However, Defendant Munoz-Villalba argues that the subsequent warrantless search of the red Nissan Sentra was conducted pursuant to an "unlawful seizure" because the

State Police had no reasonable suspicion to justify further detention and the search of the vehicle.[2] (Doc. No. 46-2 at 6.) At the suppression hearing, Munoz-Villalba testified that he never gave the troopers consent to search the vehicle. (Transcript at 86-88.) Munoz-Villalba testified further that he asked the troopers if a search was necessary and was subsequently physically separated from the car while the vehicle was searched. (Id.) Munoz-Villalba testified that, although he was told he was free to go, he did not feel free to leave. (Id. at 89.) The Government asserts that the search of the vehicle was lawfully conducted pursuant to Defendant Munoz-Villalba's voluntary consent and that Munoz-Villalba was free to leave at any time. At the hearing, both troopers testified that Munoz-Villalba orally consented to the search of the vehicle. (Id. at 17-19, 54, 76.)

A warrantless search is per se unreasonable under the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "It is well settled, however, that a search conducted pursuant to consent is one of the specifically established exceptions to the search warrant requirement." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) (citations omitted). The Supreme Court has instructed that "when a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Schneckloth, 412 U.S. at 222 (internal quotation marks and citations omitted). Whether a party has voluntarily consented to a search request is determined from the totality of the circumstances. Id. at 227. The Third Circuit has explained as follows:

> [W]hether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single

---

[2] Guerrero concedes that he does not have standing to challenge the validity of this search.

> criterion. Certain facts that courts consider in determining whether
> confessions were voluntary, such as the age of the accused, his
> education, his intelligence, whether he was advised of his
> constitutional rights, and whether the questioning was repeated
> and prolonged are relevant to [the] examination.

United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994) (internal citations omitted).  Although knowledge of the right to refuse consent is one factor to be taken into account, "the government need not establish such knowledge as the sine qua non of an effective consent."  Schneckloth, 412 U.S. at 227.  Moreover, the Fourth Amendment does not require that the government advise a suspect of his right to refuse consent before requesting such consent.  Kim, 27 F.3d at 955 (internal citation omitted).  Similarly, the government is not obligated to advise a detained suspect that he is "free to go" in order for a consent search to be deemed voluntary.  Ohio v. Robinette, 519 U.S. 33, 39 (1996).

In Kim, the Third Circuit determined that a suspect had voluntarily consented to a search request after noting the suspect's voluntary cooperation, the short duration of the encounter between officers and the suspect, the lack of threat of force, the courteous tone of the conversation, the limited number of law enforcement officers present, and the lack of repeated questioning.  Kim, 27 F.3d at 955.  The Court also noted that the law enforcement officers did not ask the suspect "direct, probing, or incriminating questions" although he was advised that officers were looking for illegal drugs.  Id.

Applying these considerations to the case at bar, the Court finds that Defendant Munoz-Villalba voluntarily consented to Trooper Foulds' request to search the Sentra.  Trooper Foulds testified that after advising Munoz-Villalba of his motor vehicle violation, he advised Munoz-Villalba that he was free to go.  (Transcript at 16.)  Munoz-Villalba then asked for directions to

get back to Reading, Pennsylvania.  (Id.)  After giving him directions, Trooper Foulds asked if Munoz-Villalba "had any type of contraband, weapons, stolen property, [or] drugs" in his vehicle.  (Id. at 17.)  When Munoz-Villalba replied that he did not have the above in the vehicle, Trooper Foulds asked if "he would mind us looking."  (Id. at 17-18.)  Both Trooper Foulds and Todaro testified at hearing that Munoz-Villalba then agreed to the subsequent search.  (Id. at 17-19, 54, 76.)  Although Munoz-Villalba's testimony differs greatly from that of the officers on this point, upon consideration of the demeanor of the witnesses and the testimony given at the hearing, the Court credits the troopers' testimony at hearing.  The Court finds that Munoz-Villalba gave the Troopers oral consent to search the vehicle.  Accordingly, the Court must determine whether this consent was intelligent and voluntary.

　　　The record contains no facts as to Munoz-Villalba's educational background or his intelligence.  During the hearing, Munoz-Villalba testified competently and showed no sign of mental deficiency or defect.  The Court notes that English is not Munoz-Villalba's first language and Munoz-Villalba requested the periodic assistance of a Spanish interpreter during his testimony at hearing.  However, Munoz-Villalba was able to understand most of the questions posed to him in English during the hearing and respond in English.  Munoz-Villalba's counsel represented to this Court that Munoz-Villalba could speak limited English.  (Transcript at 83-85.)  Moreover, Munoz-Villalba testified that he responded to Trooper Foulds' request to search in a way that indicated that he understood the request.  (Id. at 86-87, 94-95.)  The Court finds that Munoz-Villalba understood the request prior to offering his consent to search.

　　　The Court does not find the presence of two police officers in uniform to have been excessive for a routine traffic stop, nor that their presence was coercive.  Both officers parked

9

their police vehicles behind Munoz-Villalba's Sentra along the side of the roadway, and did not block the vehicle's egress.  Further, there is no credible testimony that either officer displayed a weapon, or showed any sign of aggression towards Defendants.  Moreover, although the Defendants were separated from the vehicle during the actual search, they were told that they were free to leave and the Court finds no credible evidence that they were prevented from leaving.

Munoz-Villalba further argues that the duration of the traffic stop and the scope of Trooper Foulds questions amounted to an unjustified detention.  (Doc. No. 46-2.)  Absent reasonable suspicion of criminal activity unrelated to the initial purpose of a traffic stop, detention must end and the detainee must be allowed to leave once the officers have completed the activities related to the stop.  United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975) ("stop and inquiry must be 'reasonably related in scope to the justification for their initiation'" ) (quoting Terry v. Ohio, 392 U.S. 1, 29, 88 (1968)); Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop").  During a traffic stop, the officer must limit his questioning to matters directly related to the traffic stop.  Berkemer v. McCarty, 468 U.S. 420, 439 (1984).  If in the course of the officer's routine questioning, however, the officer identifies articulable facts that create a reasonable suspicion of additional criminal activity, the officer may continue to detain the driver and investigate the facts giving rise to the additional suspicion. Berkemer, 468 U.S. at 439 (citing Terry v. Ohio, 392 U.S. 1, 29 (1968)); See United States v. Johnson 63 F.3d 242, 247 (3d Cir. 1995).  The officer may ask "a moderate number of questions. . . . To try to obtain information confirming or dispelling the officer's suspicions."  Berkemer,

468 U.S. at 439.

However, once the traffic stop has concluded and the defendant is told he is free to leave, an officer is free to ask further questions, so long as the continued encounter is consensual. United States v. Wilson, 413 F.3d 382, 388 n.6 (3d Cir. 2005). It is well established that no seizure has occurred when an officer approaches an individual in a public place, identifies himself as a law enforcement agent, asks questions, asks to search a person's bags, or explains that he is conducting a narcotics investigation. See Florida v. Royer, 460 U.S. 491, 497 (1983) (questioning by police in airport did not amount to seizure); Wilson, 413 F.3d at 388 (further questioning by officer after defendant was given a traffic citation and told he was free to leave did not constitute seizure). If a reasonable person would feel free to terminate the encounter, then he or she has not been seized. Florida v. Bostick, 501 U.S. 429, 433-35 (1991) (stating that consensual encounters do not implicate the Fourth Amendment).

In United States v. Wilson, the defendant was stopped for speeding in a rental car on the Pennsylvania turnpike. 413 F.3d at 384. Although the officer found irregularities with the vehicle's rental agreement, the car was not reported stolen. Id. After the officer returned Wilson's documents and told him he was free to leave, the officer began to ask Wilson about the rental agreement and his destination. Id. Finding irregularities between Wilson's statements and those of his passengers, the officer continued his questioning. Id. In order to dissuade the officer that criminal activity was afoot, Wilson opened the trunk of the vehicle to show the officer that he was transporting CDs for sale. Id. at 384-85. The officer asked for and was given permission to search a bag in the trunk of the vehicle. Id. at 385. The bag contained cocaine. Id. The Third Circuit Court of Appeals found that Wilson had not been seized during the stop

11

and had consented to the search of the bag. Id. at 388. Because the Court of Appeals "determined that no seizure occurred, i.e., that Wilson's continued encounter with [the police officer] was consensual, we need not reach Wilson's argument that [the police officer] did not have a reasonable articulable suspicion of criminal activity that justified his further questioning." Id. at 388 n.6 (citing Bostick, 501 U.S. at 433-34).

According to the chronology of events presented at hearing in the instant case, the traffic stop prior to the consent lasted no more than twenty-minutes and did not involve extensive questioning by the officers. Trooper Foulds' questions during the traffic stop were limited to identification and irregularities with the rental agreement, such as why Munoz-Villalba was not listed as an authorized driver on the agreement and the reason for the excessive amount of miles driven during the last two weeks. Trooper concluded the traffic stop and told Munoz-Villalba that he was free to leave before asking him questions about the contents of his vehicle. Moreover, Munoz-Villalba engaged Trooper Foulds in conversation after the traffic stop had concluded. Although twenty-minutes may be longer than the average traffic stop, the Court does not find the length of time unduly burdensome or coercive under the present circumstances.

Upon consideration of the totality of the circumstances of this case, the Court concludes that the Government has satisfied its burden of demonstrating that Defendant Munoz-Villalba voluntarily and knowingly consented to Trooper Foulds' request to search the Sentra and the subsequent search of the vehicle was lawful.[3] Moreover, the Court finds that Munoz-Villalba's

---

[3] In Florida v. Jimeno, the Supreme Court held that "it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container." 500 U.S. 248, 251 (1991). Accordingly, the consent to search the vehicle extended to opening the Conair Fabric

continued encounter with Trooper Foulds was consensual and did not amount to continued detention. Accordingly, Defendant Munoz-Villalba's Motion to Suppress Evidence will be denied.

### B.  Search of Thomas Guerrero Incident to Arrest

In his motion to suppress, Defendant Guerrero argues that the State Police's search of him incident to arrest was unlawful because there was no basis for his arrest. (Doc. No. 50 at 4.) While "'the probable-cause standard is incapable of precise definition or quantification,' all interpretations of probable cause require a belief of guilt that is reasonable, as opposed to certain." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)); see also Hill v. California, 401 U.S. 797, 804 (1971) ("Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. . . ."). The probable cause standard is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Pringle, 540 U.S. at 370-71 (internal quotations omitted). In the portion of its brief addressing Defendant Guerrero's motion, the Government relies heavily upon Maryland v. Pringle, supra. In Pringle, a vehicle with three occupants was caught speeding in Maryland. 540 US. at 367. Pringle was seated in the front passenger seat. Id. During a consent search of the vehicle, the officer found $763 in the glove compartment and five plastic baggies of cocaine behind the back seat armrest. The Supreme Court found that the police had reasonable

---

Steamer box.

cause to arrest Pringle because:

> Pringle was one of the three men riding in a Nissan Maxima at 3:16 a.m.[;] [t]here was $763 of rolled-up cash in the glove compartment directly in front of Pringle[;] [f]ive plastic glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men[;] [and upon] questioning, the three men failed to offer any information with respect to the ownership of the cocaine or the money.

540 U.S. at 371-72.  Based upon the above, the Supreme Court found:

> it an entirely reasonable inference from these fact that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine.  Thus a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly. . . .  The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

Id. at 372-33 (dismissing Pringle's "attempt to characterize this case as a guilt-by-association case [as] unavailing").

The instant matter is distinguishable from Pringle.  Prior to Guerrero's arrest, no large sum of money had been found nor were the hidden drugs readily accessible to Guerrero. Although neither defendant owned or rented the vehicle, Munoz-Villalba, as driver, controlled access to the trunk.  Moreover, when asked if everything in the vehicle was his, Munoz-Villalba replied in the affirmative.  The only information known to the troopers at the time of the arrest was that Munoz-Villalba had been driving a vehicle, rented by a third party, 3,000 miles over the previous fortnight, and that a modest quantity of narcotics was hidden in a box in the trunk of the vehicle, to which Munoz-Villalba had previously claimed ownership.  During the hearing, the officers gave no testimony as to Guerrero's relationship with Munoz-Villalba, the vehicle, or the drugs beyond "the mere fact that he occupied the vehicle along with the driver . . . ." (Transcript

at 78.) Neither officer testified to seeing any nervous or suspicious behavior exhibited by Guerrero.

In United States v. Di Re, New York Police officers were informed by one Mr. Reed that he was planning on buying counterfeit gasoline ration coupons from a Mr. Buttitta on a specific day at a specific place. 332 U.S. 581, 582 (1948). Upon arriving at the designated location, the officers found a vehicle with Buttitta in the driver's seat, Reed in the back seat, and the defendant in the front passenger seat. Id. Mr. Reed had two tickets in his hands, which later proved to be counterfeit. Id. The Supreme Court found that "the presence of Di Re in the car did not authorize an inference of participation in the Buttitta-Reed sale . . . . There is no evidence that it is a fact or that the officers had any information indicating that Di Re was in the car when Reed obtained ration coupons from Buttitta, and none that he heard or took part in any conversation on the subject." Id. at 593. In that case, the informant's testimony singled out the driver as the guilty party. Id. at 592. In the case at bar, Munoz-Villalba admitted that everything in the vehicle was his. Nothing beyond Guerrero's mere presence in the vehicle connects him to the controlled substances found hidden in the trunk. Viewing the totality of circumstances and upon consideration of the applicable law, the Court finds that the officers did not have probable cause to arrest Guerrero.

Having concluded that Guerrero was arrested without probable cause, the Court must then examine whether the evidence found during the search incident to the arrest should be excluded as the fruit of the poisonous tree or whether the taint of the illegal search had been purged by some intervening event. The State Police had already searched both Defendants for weapons prior to the vehicle search and found nothing. The Government fails to offer any

argument or evidence that the money and 30 grams of cocaine found on Guerrero incident to his arrest would have been found irrespective of the arrest.  Nor does the Government suggest that any meaningful event occurred between the arrest and the search as to purge the taint of the illegal arrest.  At the time of the second personal search, the State Police knew nothing about Guerrero except that he had been sitting in the vehicle with Munoz-Villalba, was of Panamanian citizenship, and had no warrants out for his arrest.  Accordingly, the Court finds that all of the evidence discovered on Guerrero's person during the search incident to his arrest must be suppressed.

**III.     Order**

AND NOW, this 15th day of November, 2005, **IT IS HEREBY ORDERED THAT** Defendant Munoz-Villalba's Motion to Suppress Evidence (Doc. No. 46) is **DENIED**.  **IT IS FURTHER ORDERED THAT** Defendant Guerrero's Motion to Suppress Evidence (Doc. No. 49) is **GRANTED**.  All physical evidence seized or obtained following Defendant Guerrero's arrest in this case shall be suppressed and inadmissible at trial.

       S/ Yvette Kane
Yvette Kane
United States District Judge

Dated: November 15, 2005